Good morning. My name is Melanie Yang, attorney for petitioner Ren. May I please the court? In my opinion, the 9th Circuit Court should find the immigration judge should reverse the adverse criminal finding because this case, the asylum application was filed in February 2003. Real ID laws should apply. In this case, the immigration judge's adverse criminal finding mainly based on the forensic expert Eileen Wood's testimony. However, the immigration judge gave too much weight to that expert opinion. Since the two documents at issue, one is a police sermon, the other is a fine receipt. For the police sermon, the expert witness only said she had some doubt about the authenticity of the document at administrative record 110 pages. And for the second, the expert witness' conclusion is the document's fine receipt is probably not genuine. Her general assumption is all the government forms in China was printed by a printing shop. Thus, she examined these two documents. She found these two documents were ---- Well, that wasn't really her general assumption as to the second document in particular. I mean, she said, you know, we might want to Xerox them. They might possibly Xerox someone, but that's the second document. And this is why she was so definitive about it, was created by several different methods, and that didn't make any sense. Your Honor, since she does not have a gene specimen from that locality, from the local police department, actually she ---- But in the end, the IJ had a person who seemed to be generally as expert as anybody is, standing up there, giving her criteria, and being very measured, and saying, well, as to the first, I would say it's 1 in 200 likelihood that it's invalid. As to the second, she said, I forget what number she gave, but it was infinitesimal that it wasn't, that it was valid. And why couldn't he rely on that? She said probably not a gene, and since she has no specimen to compare, and also she cannot point out, you know, because of ---- She did not, like, say specifically why this receipt was provided by three procedures to complete that fine receipt. I think she cannot exclude, like, the local police office used the same method, like, printed in their offices, because right now the inject printer copy machines are wide available in every office in China, and a lot of printing shops are going out of business. It's the same kind of method that could be used by the police station. Where did that receipt, how did it originate? That receipt came from Kuai'an Subpolice Station, Maui District, Fujian Province, China. She got it from her father. She got it from her father. From her father, yes. And also the second question is, she herself had no knowledge whether it's authentic or it's false, because during the immigration hearing, the judge did not, you know, carefully examine on her, do you have knowledge this is not real? How did your father give it to you? The father gave it to her, but she had been there when it was received, right? It wasn't like he had to go somewhere to get it. It was already in the house. Yes. When she met her father, her father showed her this receipt. Right. So she'd seen it before. She saw it before, yes. And so in order for it to be fraudulent and for her to not know it, her father would have somehow have had to, if in fact she was telling the truth about having seen it, her father would have had to somehow go and get a different one, other than the one that she'd seen? For the petitioner, her knowledge about whether this is authentic or fake is only during the hearing. That is the first time she heard somebody challenge, oh, this receipt is not what it was. But in terms of our case law saying that where somebody sends you a document, you don't necessarily know whether it's fraudulent or not, that's true if somebody went somewhere to get it or claimed to have gone somewhere to get it, but if it claims to be a document that you'd already seen before, back when you were in your original country, then how could it have become fraudulent and her not know it? She did not. Petitioner thought her father told her he paid the money, got the receipt. She had no reason to doubt the receipt was not authentic. But she had seen this receipt back in China. Yes. It isn't that he went and got it after she left. No. But at that time, she had no reason to suspect the receipt had a problem. Well, the father paid the fine. He paid money, right? Correct. To the police, and they gave him a receipt. Correct. And did he get the receipt the same time he paid the money? Yes. And then when did he show it to his daughter? That day, the next day? When the daughter was released, like daughter met the father, then father told the daughter, okay, I already paid the fine. And here is the receipt. Correct. So she'd seen it right away. According to her story, she'd seen it right away. Correct. Yeah, so she saw it right away. So this so-called handwriting expert said it was three processes or four processes were used to create this receipt. The expert says on the receipt there's a seal. One is a round seal, one is a rectangle seal, and also have different color. She said, you know, this looks like you need to go through proper printer or copy machine twice or three times to complete. She said it essentially had an inkjet printer, a laser printer, as I understood it, and a letterpress numbering. Is that what she said? Correct. But she did not give us any example why the local police, you know, cannot get the same kind of receipt as what presented by the petitioner. There were some other reasons, too, weren't there, for just finding the credibility? Yes. The other reason is a translation mistake. The local police station's name is Kui'an. However, initially on the statement, the translator translated it as Lin'an because the Chinese character for Lin'an and Kui'an look similar. This mistake has been corrected twice. One is during the initial interview at Anaheim Asylum office. Second was corrected during the merits hearing. However, I do not know why the immigration judge always holds this issue against the petitioner because this has been corrected. Usually, in my experience, if you corrected the mistake and the mistake is obvious, it's a translator mistake, we should not use this to support the adverse credibility finding. And the Chinese character is on administration record 283. Even today, we can tell this is a translation mistake because in Chinese, it's Kui'an, but English translation is Lin'an. Usually, the name of Chinese city or place, we just translate it according to pronunciation. So, this is a clear mistake. Anybody know Chinese and English can tell from the record itself it's a translation mistake. And I think also the judge mentioned the Chinese household register book, the information, the petitioner as indicated as a student. When the petitioner left China, of course, she already graduated and was not a student. So the judge says that's inconsistency. Petitioner's explanation is just simply the Public Security Bureau didn't update her household register. You know, after she graduated, of course, she's not a student. She already gave the reasonable explanation on that. Her basic story was that she became a Chinese Christian because she was in despair because her engagement broke up. Was that basically it? No. She became a Christian because some friend introduced Christianity for her. And why she had to come to the United States, had to enter without inspection, is she was rejected the visa twice. So she has no other legitimate way to come to the United States. But the visas that were applied for were fiancé visas. Correct. Right. Yes. And I thought she said that because her visas were rejected, her fiancé broke up with her and then she was in despair and then she was looking for something to make her feel better. Correct. Right. Yes. Did she ever meet this fiancé? I have no knowledge on that. I believe they did not have any relationship at this point. Was this an arranged marriage? I think introduced by friend. My impression is that he was in the United States, was arranged marriage, and she never actually met him. Is that consistent with the record? I'm not quite sure about the definition of arranged marriage. Well, she had never met the guy. No. The United States citizen went to China to meet with her. I'm sorry, I can't hear you. The U.S. citizen went to China to meet with her. I see. Who did? Personal contact. Oh, okay. Probably I reserve one minute and 50 seconds for rebuttal. Good morning. May it please the Court, my name is Amy Fettersen and I represent the government in this matter. The sole question before the Court is whether substantial evidence supports the immigration judge's conclusion that the petitioner failed to offer credible testimony in support of her asylum application. You may want to slow down a little bit. Sorry. Because the petitioner submitted fraudulent documents to bolster her claim and offered inconsistent testimony regarding those documents, the substantial evidence supports the immigration judge's conclusion that the petitioner failed to meet her burden of proof. Okay, so I think we're focused on that. I have a question about, we've been talking about the receipt. That's the one that the forensic expert had strong doubts about, its genuineness. So we've talked about that, maybe we can come back to that. But on the summons for the police department, the expert did not have strong doubts. To her credit, she said she had suspicions, but she couldn't conclude that it was counterfeit. So therefore the IJ relied on the notion that somehow it didn't make any sense for the summons to be the date on which she was released. But the petitioner had what seemed a plausible explanation, is that the police handed those out when you were being released as evidence that you had actually been incarcerated, whatever their purpose was. Why can the IJ speculate around that kind of explanation? The immigration judge's decision was based on two separate things. The first was the expert's testimony that it was likely that the document was fraudulent. She cited that it was about a 1 in 200 chance that the summons was actually genuine. The second had to do with the petitioner's testimony about the circumstances. She testified that the document was handed to her on the day that she was released in December, but the document was actually dated on November 18th. I just said that in my question. Right. How about addressing what I asked? Although the petitioner offered an explanation, the IJ... I told you what the explanation... Counsel? Right. Okay, look, I asked you a question. Assume that when I ask a question that predicates it on my recitation of what you just told me, I don't need to be told what the IJ said. I'm asking you now to explain at the next level. The question I have is, given the explanation that the petitioner gave, that I assume in my question was plausible, I asked you, how can the IJ speculate around it? How does the IJ have any information or any knowledge or basis for saying that her explanation was not credible? Well, the IJ is not required to credit her testimony, particularly in this case where there's other evidence. But she can't speculate. The IJ can't speculate. She doesn't just get... The IJ doesn't just get to hear it and say, well, I don't believe it. She has to give some reason for that. Well, I think in this particular case, the reason was a combination of those two factors. Well, I'm asking you to tell me... Look, the forensic expert made a differentiation, as I understand, between the receipt and the summons as her degree of confidence as to whether it was counterfeit. Yes. Is that correct? Yes, that is correct. And she was more confident that the receipt was counterfeit than the summons. Is that correct? Yes, that is correct. Okay. Now, with that state of affairs, the IJ then went to, on the summons, her questioning the date to establish that the document was counterfeit. That's what the IJ is doing. Okay, and she asks the petitioner to explain it, and the petitioner gave what, on its face, is not a frivolous or implausible explanation. So are you saying that no matter what the petitioner says, the IJ is free without more to reject it? It's not that the IJ is free without more to reject it. It's that the document had already been called into question. I mean to reject the explanation. Right. And I think, Your Honor, that the answer to your question is that, in this case, the immigration judge was very influenced by the expert testimony that there was only a 1 in 200 chance that this was. So it all turns on that, basically. Yes. Okay. And the petitioner focuses a large part of her argument on challenging the immigration judge's finding that the documents were fraudulent. And this is a factual determination that the immigration judge made after weighing the evidence. And I think that the answer to your question is really that the petitioner's explanation was one factor that the immigration judge considered in weighing the evidence. But given the expert testimony, that outweighed the petitioner's explanation, which, while plausible, was not so convincing as to overcome the immigration judge's conclusion. Are the documents the only basis for the adverse credibility finding? They are the primary basis for the adverse credibility finding, yes. The immigration judge did point to several other consistencies. Don't we have case law suggesting that where fraudulent documents are the only basis, or the sole, that can't be the sole basis ordinarily? This Court's case law, I presume that Your Honor is referring to Yeeman Berhe v. Ashcroft, which is 393F3D, Part 907, where the Court distinguished between fraudulent documents that were regarding flight from their home country and entry to the United States and documents regarding the heart of the claim. And in that case determined that based on the totality of the record, the use of the fraudulent document was insufficient to support the adverse credibility. But here there were other grounds. I don't know why you're not relying on them. There were other grounds that the I.J. gave. Well, in this case there were other grounds, one of which was that her testimony regarding her work status was at odds with the documentation that she provided. She provided her house registration. Well, there was that. There was the fact that she had this Malaysian visa, which she claimed she didn't know anything about. There was the fact that she had these other fiancé visas, suggesting she was quite intent on getting to the United States one way or another. There were the fact that she wasn't actually going to church much, even though she claimed that that was the basis for her. And the immigration judge relied on all of those facts in determining the adverse credibility, even though one of the main reasons was because of these fraudulent documents. And the Court has previously held that the totality of the record is a consideration in determining whether the use of a fraudulent document might support an adverse credibility determination. The fraudulent documents that were submitted in this case went to the heart of the petitioner's claim because they addressed the only instance in which she had a run-in with the police. And combined with the other inconsistencies that the immigration judge submitted, the totality of the circumstances in this case supports the immigration judge's adverse credibility determination. The petitioner doesn't have any significant argument that she didn't know or shouldn't have known that the documents were fraudulent because she testified that the summons were given to her at the police station and that she was there and saw the fine receipt being given to her father. And because she should have known that these documents were fraudulent given her testimony, that they were given to her and provided in her presence, the fact that the expert testimony concluded that they were not genuine documents goes to the heart of her claim and supports the immigration judge. How would she know when she was there? You said that she was there when her father paid the fine? Yes. She testified that she saw her father pay the fine and that the receipt was handed to him, but that she saw it. It isn't that she would know, because if for some reason the people giving the document had made a fraudulent document, it isn't that she wouldn't know that it was a fraudulent document, but it's instead that if it was fraudulent, her story – there's no reason to think that someone went and got it from somewhere else and arranged for it to be fabricated and she didn't know it, because that's not her story. Her story is that somebody went and got it from somewhere else. Right. In the case where the court found that inhumane, what happened in that case was that her sister testified, and her sister testified that she had obtained the record on the petitioner's behalf, and it was that record that was fraudulent. And in that case, the petitioner provided other genuine, authentic documents in support of her asylum application, but that's not what happened here. And also, the sister could have gone and gotten a fraudulent document, because she didn't claim to have been around when the document was gotten. Correct. But in this case, she testified that she was there when the documents were obtained, and so the fact that those documents were then fraudulent casts significant doubt on her story. And the immigration judge, therefore, was proper in concluding that she did not offer credible testimony. Well, tell me the name of the expert again. It's Ms. Wood, I believe. She works for the Department of Homeland Security, and she testified that she reviews 2,000 to 3,000 documents per year, and that she finds that 95% of the documents that she reviews are authentic. But she was qualified as an expert, and in her expert opinion, concluded that there were significant reasons to doubt the summons that was issued, and that the receipt was almost certainly not authentic. And the summons she said was 1 in 200 that it was? That it was authentic, yes. The odds were what, 1 in 200? 1 in 200 that the summons was authentic, and she said 1 in about 100,000 that the receipt was authentic. I'm sorry, what was on the receipt? The receipt said... What were the odds? It was 1 in 100,000. So that's a considerable difference between... Right. It demonstrates that she was much more certain that the receipt was fraudulent, but 1 in 200 are still not great odds that the summons was authentic. Okay, thank you. Yeah, well... There's a story about some famous comedian who had a heart attack and went into an emergency room in Manhattan, and he asked, well, what are my odds? And he said, your odds are 50-50. You're going to make it. And so he told the ambulance driver, just get me to a hospital where the odds are better. If I had nothing else. Thank you. Thank you. I think it was George Jessel. All right. I believe the final conclusion is the FDA expert testified that the receipt is probably not gene, and I didn't... The number, I do not know how the expert get the number. However, I believe the expert, if she can get the number, like 1%, 2%, I will challenge she did not meet the US Supreme Court Dubai v. Meriden pharmaceutical test. Because I do not believe she has a scientific, accurate way to testify how much percentage this is true or false, not like DNA test. You have certain things widely accepted. Well, perhaps you could have put an expert disputing her, but you didn't do that. And the expert also admits she does not have gene specimen. If she has a gene specimen, I think her conclusion will be more concise and probably the immigration judge should give more weight. On certain level, she spews speculation. And also in China, you give money to the police station, sometimes people just write a piece of paper, and this is your receipt. But her whole point here was that isn't what happened. It was a very elaborate piece of paper, in fact. If it had been something informal, that would have been one thing, but it was actually something that took several steps to create on several different pieces of machinery. She may not be able to entirely exclude it, but the question is could the IJ rely on her very firm judgment and opinion on this. I agree judge's adverse credibility. The strongest is only this receipt. The other one is like she said she only cast a little bit of doubt about authenticity on that police sermon. And basically, Elaine Wooden, the expert, based on her conclusion, based on some general assumptions, she had, because of her work experience with Chinese documents, but she did not correct a specimen to compare with this one. Like if the DNA test you have to correct from your relatives to compare with this one, that one is more scientifically accurate. So I do not believe the government counsels presented the percentage-wise the number has been scientifically established and should be relying on it. And that's it. Thank you. Okay. Thank you very much.
judges: Pregerson, Fisher, Berzon